IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SEVERSTAL SPARROWS POINT, LLC,     \*

     \*

     \*

            v.     \*    Case No.: 1:09-cv-00-852

     \*

     \*

ENERGY ENVIRONMENTAL     \*

DEVELOPMENT CO., INC.     \*

     \*

     \*

     \*\*\*\*\*

MEMORANDUM

Now pending before the court is a Motion for Summary Judgment filed by the Plaintiff and Counterclaim Defendant Severstal Sparrows Point LLC ("Severstal") and a Motion for Summary Judgment filed by the Defendant and Counterclaim Plaintiff Energy Environmental Development Co. ("EED"). The instant dispute relates to a Waste Heat Recovery System ("the System") EED installed in Severstal's steel mill plant ("the Plant"), and specifically whether EED can be compelled to remove the System. Severstal contends that EED breached the parties' operating agreement, thereby permitting Severstal to demand that EED remove the system from the Plant at EED's expense. EED disputes Severstal's construction of the parties' contract and argues that termination was improper. EED seeks compensation for conversion of the system and for unpaid invoices. For the reasons that follow, Severstal's Motion for Summary Judgment will be granted in part and denied in part and EED's Motion for Summary Judgment will be granted in part and denied in part.

## I. Background

Before Severstal succeeded to ownership of the Plant, it was owned by Bethlehem Steel Corporation ("Bethlehem"). Bethlehem eventually sold the Plant to ISG Sparrows Point, LLC ("ISG"), which sold the Plant to Mittal, which merged with Arcelor, which ultimately sold the Plant to Severstal. (*See* Mem. in Supp. of Severstal's Mot. for Summ. J., ("Severstal's Mem.") at 1, Ex. 4.)

Throughout these changes in ownership, EED maintained the System at the Plant. (*Id.*, Ex. 8.) The System is attached to the "L" blast furnace and is designed to recover heat from the exhaust ducts that would otherwise escape into the atmosphere. (*Id.* at 5.) The System then redirects the trapped heat back into the "L" blast furnace, thereby decreasing the fuel necessary to properly heat the furnace. (*Id.* at Ex. 1, License and Operating Agreement ("Agreement") at 1.) This increased efficiency can result in significant cost savings. (*Id.*, Ex. 1, Agreement at 1.)

On or about August 20, 1999, Bethlehem entered into a "License and Operating Agreement for Waste Heat Recovery" ("the Agreement") with EED. (*Id.*, Ex. 1, Agreement 1.) The purpose of the Agreement was to provide for the continued "modification, overhaul, maintenance and upgrade" of the System. (*Id.*, Ex. 1 Agreement at 2.) Specifically, EED was required to:

> Repair, overhaul, maintain and upgrade, without cost to Bethlehem, the . . . System in accordance with the plan set forth in the 1999 Technical proposal . . . [The] System shall incorporate the equipment described in the 1999 Technical Proposal and other such equipment EED shall deem necessary and shall have been approved by Bethlehem to enable it to remove heat from the stove stack and automatically utilize it to preheat the combustion air and gas for the stoves in accordance with the 1999 Technical Proposal . . . During the term of this Agreement, EED shall, without cost to Bethlehem, maintain the . . . System in good operating condition capable of performing in accordance with specifications of the 1999 Technical Proposal.

(*Id.*, Ex. 1 Agreement at 5-6)  The 1999 Technical Proposal details the design of the System, its

component parts, and how it will operate.  (*Id.,* Ex. 1, Technical Proposal.)  It also provides a

target heat recovery rate of 65,000,000 BTU/hr, contingent upon certain environmental

preconditions outside EED's control.  (*Id.*, Ex. 1, Technical Proposal at 9.)

      If either party is found to be in breach of the Agreement, they are afforded 30 days to

take corrective action.  (*Id.*, Ex. 1, Agreement at 17.)  If no action is taken, the non-breaching

party may terminate the Agreement after providing 30 days notice.  (*Id.*, Ex. 1, Agreement at 18.)

If the Plant owner terminates the Agreement, it may take one of three remedial steps: 1) purchase

the System from EED at its fair market value; 2) require EED to remove the System at EED's

expense and return the Plant to the conditions existing at the date of the Agreement; or 3) remove

the System, and repair the "L" furnace for the account of EED.  (*Id.,* Agreement at 18-19.)

      The term of the Agreement was seven years with automatic one year renewals after the

expiration of the initial term, at which point either party could terminate after providing 90 days

notice.  (*Id.*, Ex. 1, Agreement at 4.)  Severstal contends that the Agreement remained valid on

September 12, 2008 when it sought to terminate its relationship with EED and force EED to

remove the System from the Plant.

      EED argues that a 2004 contract modification to the Agreement eliminated EED's

performance obligations, and by extension, Severstal's proffered basis for termination.  In 2004,

during the initial term of the Agreement, ISG purchased the Plant from Bethlehem.  EED claims

that ISG then modified the term of the Agreement from seven years to month to month.  (Mem.

in Supp. of EED's Mot. for Summ. J. ("EED.'s Mem.") at 8, Ex A, Richard Brown Dep. at 81:2:-

82:20.)  According to EED, ISG also insisted that EED obtain new purchase orders each month,

whereas EED had previously been operating under a blanket purchase order.  (*Id.* at 9, Ex. F,

Jack Cargnoni Decl. at ¶¶5-7.)  EED claims that ISG provided notice of these modifications in

the form of a letter (the "30-Day Letter").  Neither party has introduced a copy of the letter.

EED claims that its understanding of the 30-Day Letter as modifying the Agreement term was

orally confirmed by ISG personnel.  (*Id.*, Ex. H, Jack Cargnoni Dep. at 28:16-30.)

EED contends that the modification of the Agreement term also constituted a

modification of EED's obligation to make substantial investments and repairs in the System,

since EED would only be guaranteed a return on their investment under a long term agreement.

(*Id.*, Ex. F, Jack Cargnoni Decl. at ¶¶9-10.)  After the issuance of the 30-Day Letter, EED

pursued a new long term contract for the maintenance and operation of the system.  To that end,

EED sent ISG a letter in October 26, 2004 stating its understanding that they were operating

under a 30 day contract and requesting a new long term contract to permit specified repairs.  (*Id.,*

Ex. E.)  A new agreement was not entered into, and the repairs EED identified in its 2004 letter

went unaddressed by either EED or Severstal's predecessors.  (*Id*. at 6.)

In September 2008, Severstal informed EED that it was terminating the Agreement due to

the System's state of disrepair and EED's refusal to take the requisite corrective action.  Many of

the System's deficiencies Severstal complained of were first identified in EED's letter to ISG in

October 2004 and never addressed, yet none of Severstal's predecessors had attempted to

terminate the Agreement or declare EED in default.  (*Id*. at 6.)  Following termination, and

pursuant to the Agreement, Severstal demanded that EED remove the System from the Plant.

At present, the System remains installed.  (Severstal Mem. at 8, Ex. 5, Jack Cargnoni

Dep. at 73:9.)  Severstal seeks to compel EED to remove it, at EED's expense.  (*Id.* at 7, Ex. 1,

Agreement at 17.)  EED contends that Severstal has blocked its access to the System and refused

to provide the requisite assistance for removal.  (EED Mem. at 29.)  The parties agree that the

System is in need of certain repairs and upgrades. The crux of the parties' dispute is whether Severstal properly terminated the agreement and thereby triggered the provision of the Agreement requiring EED to remove the System. (Severstal Mem., Ex. 1, Agreement at 17.)

## I.  Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); *Alpha Constr. and Eng'g Corp. v. Ins. Co. of State of Pennsylvania*, 601 F. Supp. 2d 684, 688 (D. Md. 2009). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 77 U.S. 242, 248 (1986). "When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Alpha Constr.*, 601 F. Supp. 2d at 688 (internal marks omitted) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir.2003)).

Whether a contract is reasonably capable of only one construction, or is ambiguous, is a question of law to be decided by the court. *Keffer v. H.K. Porter Co., Inc.,* 872 F.2d 60, 62 (4th Cir. 1989). Contracts are interpreted "as a whole," and "the terms of the agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words." *Id.* (internal quotation marks omitted). The purpose of contract interpretation is to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself. *See Turner v. Turner*, 809 A.2d 18, 49 (2002). Therefore, a court must "give effect to the contract's plain

meaning, without regard to what the parties to the contract thought it meant or intended it to mean." *Id*. (internal quotation marks & alteration omitted). In construing unambiguous terms, the test is "what a reasonable person in the position of the parties would have thought the contract meant." *Id.*

## II. Analysis

Severstal and EED have filed motions for summary judgment. Each motion will be considered in turn.

## A.

With respect to Severstal's Motion for Summary Judgment, EED claims that Severstal's termination of their contractual relationship in September 2008 was improper, therefore Severstal lacked a legitimate basis to invoke its remedies under the Agreement. EED offers two theories to support this contention. First, EED argues that under the Agreement, Severstal has failed to show a material breach. Second, EED contends that its obligations to repair and maintain the System were abrogated by a 2004 contract modification eliminating EED's obligations to make substantial improvements to the System. For the following reasons I conclude that both arguments are without merit and therefore Severstal's termination was proper.

The Agreement provides that upon breach of "any agreement" the non-breaching party may demand rectification, and if the breach is not corrected within 30 days, terminate the agreement. (Severstal Mem., Ex. 1, Agreement at 17-18.) Generally, only a material breach discharges the non-breaching party of its duty to perform. 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.); *see Final Analysis Comm'c Serv. v. Gen Dynamics Corp*., 253 Fed. App'x 307, 313 (4th Cir. 2007) (unpublished) (*citing Rogers Refrigeration Co., Inc. v. Pulliam's Garage, Inc*., 505 A.2d 878, 883 (Md. Ct. Spec. App. 1986); *Fromm Sales Co. v. Troy Sunshade Co*., 159 A.2d 860, 863

(1960)).  Under Maryland law, "[a] breach is material 'if it affects the purpose of the contract in an important or vital way.'"  *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (*quoting Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999)).  While a material breach is a general predicate to termination, it is literally "hornbook law" that "[w]here the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision." 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) (c*iting Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d 66 (N.J. 1985)).

The parties dispute what constitutes a breach of the Agreement.  EED reads the Agreement to require only that the System be capable of meeting the target heat recovery rate delineated in Section IV of the Technical Proposal.  (Reply in Supp. of EED's Mot. for Summ. J. ("EED's Reply") at 7-8.)  Any other "supposed breaches," such as those listed in Severstal's notice of default, "are immaterial" to the Agreement.  (EED Reply at 11.)  For support of its construction, EED cites to Section 2(e) of the Agreement, which provides that EED shall maintain the System "in good operating condition capable of performing in accordance with specifications of the 1999 Technical Proposal."  (Severstal Mem., Ex. 1, Agreement at 6.)  Rather than reading this language to require the System to operate in accordance with all the specifications of the 1999 Technical Proposal, EED interprets this section to require only compliance with the heat recovery "projections" established in Section IV of the Technical Proposal.  (EED Mem., at 11; Severstal's Mem., Ex. 1, Technical Proposal at 9.)  EED argues that system is capable of meeting these projections when the necessary environmental conditions are present.

EED interprets its obligations too narrowly.  Section IV of the Agreement cannot be the sole source of EED's obligations, as it does not contain an enforceable guarantee or requirement.

Instead, this Section provides what is "anticipated," noting that if preconditions outside EED's control are met, "the rate should not drop below a minimum 65,000,000 BTU/hr." (Severstal Mem., Ex. 1, Technical Proposal at 9.) The parties qualified all estimates, stating that "any modifications to . . . [the blast furnace's] . . . operation or design could effect the performance of the . . . system" and that the System will "depend heavily upon ambient conditions, which have historically varied greatly." (*Id.*) And even if all the necessary preconditions are met, Section IV indicates that the projected heat recovery rate "could" be attained and merely provides the heat recovery rate that is "anticipated." (*Id.*) The Agreement clearly provides that EED must maintain the system in compliance with the "specifications" of the Technical Proposal. Because Section IV cannot be read to impose an obligation on EED, it cannot be a "specification" referenced in the Agreement.

The clear and unambiguous language of the Agreement provides that EED is obligated to satisfy the Technical Proposal in its entirety, not merely a single section. Section 2(a) of the Agreement provides that "EED shall repair, overhaul, maintain and upgrade . . . the . . . System in accordance with the plan set forth in the 1999 Technical Proposal." (Severstal Mem., Ex. 1, Agreement at 5.) Section 2(e), relied upon by EED, requires the System to be "capable of performing in accordance with specifications of the 1999 Technical proposal." (*Id.*, Ex. 1, Agreement at 6.) Nothing in either section purports to limit EED's obligations to satisfaction of a single output projection. Given their ordinary meaning, "plan" and "specification" denote "an arrangement of parts" and a detailed, precise, explicit presentation . . . of something." *See* WEBSTERS INTERNATIONAL DICTIONARY 1730 and 2187 (3d. ed 1966). Indeed, the Technical Proposal "describes the operation and installation" of the entire System. (Severstal Mem., Ex. 1.) It details the System's component parts and the nature of its operation. (*Id.*) Consideration

of the Agreement in conjunction with the Technical Proposal clearly indicates that "specifications" refers to the entirety of the Technical Proposal.

The parties concur that System is not operating according to the specifications of the Technical Proposal. No significant improvements were made to the System after Bethlehem's sale of the Plant to ISG in 2004, although EED continued to perform regular maintenance. (*See* EED Mem., Ex. F, Decl. of Jack Cargnoni at ¶¶10, 11, 13.) In its notice of default in May of 2008, Severstal informed EED of ten equipment and operational problems with the System:

a. Numbers 1, 2, 3, and 4 Gas heat exchangers are not operational and bypassed.
b. Numbers 1, 2, 3, and 4 Gas heat exchanges outlet temperature transmitters are not operational.
c. Numbers 3 and 4 Air heat exchanger outlet temperature transmitters are not operational.
d. Outlet stack gas temperature transmitter is not operational.
e. Numerous air leaks around the access doors to the air heat exchangers resulting in loss of efficiency.
f. Missing coupling guard on pump P-130A (Safety item).
g. Economizer water outlet temperature is not able to reach 400F due to pressurizing problems causing the damper to open when the outlet temperature is ~ 310F resulting in reduced efficiency.
h. Failure to maintain a minimum of 65,000,000 BTU/hr
i. Failure to calibrate instruments annually jointly with Severstal Sparrows Point personnel.
j. Leaking panel covers on the economizer resulting in high CO, resulting in placing WHRS out of service.

(Severstal Mem., Ex. 6.) In his deposition, EED employee Richard Brown concurred with the operational deficiencies. (EED Mem., Ex. A, Richard Brown Dep. 69:9-11.) Jack Cargnoni ("Cargnoni"), President of EED, responded to Severstal's notice of default and also acknowledged the deficiencies, stating that item numbers "a, b, c, d, e, g, and h" were first referenced by EED in a letter to ISG in October 2004 listing System components in need of repair. (*Id.*, Ex. G.) Cargnoni also admitted that these repairs were necessary "to be in compliance with the 1999 agreement." (*Id.*, Ex. G.)

These deficiencies constitute a material breach of the Agreement and provided a proper

basis for Severstal's termination. A breach is material "if it affects the purpose of the contract in

an important or vital way." *Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App.

1998). The purpose of the 1999 Agreement was for the "modification, overhaul, maintenance

and upgrade of the . . . System . . . and to undertake the modifications and improvements in

accordance with the 1999 Technical Proposal." (Severstal Mem., Ex. 1, Agreement at 2.) The

undisputed record establishes that no substantial improvements have been made to the System

since 2004. Therefore, Severstal was justified in invoking the termination provision of the 1999

Agreement.[1]

EED argues in the alternative that whether there was a material breach of the Agreement

is irrelevant because a 2004 contract modification abrogated EED's responsibilities to conduct

significant maintenance, repairs, and investment with respect to the System. Under Maryland

law, a contract modification requires mutual assent. *L & L Corp. v. Ammendale Normal

Institute,* 236 A.2d 734, 736 (Md. 1968). A party has no right to unilateral modification if

changed circumstances alter the economic benefits of a contract. *Harford County v. Town of Bel

Air*, 704 A.2d 421, 433 (Md. 1998). Agreement to a modification can be implied and proven by

attendant circumstances and the conduct of the parties indicating acquiescence in the change.

*University Nat'l. Bank v. Wolfe*, 369 A.2d 570, 576 (Md. 1977) (holding that parties to a contract

---

[1] EED's argument that Severstal should be equitably estopped from terminating the agreement does not alter this conclusion. Estoppel is an equitable defense arising when one party causes a prejudicial change in the conduct of another. The elements of estoppels are "(1) voluntary conduct or representation, (2) reliance, and (3) detriment." *Lampton v. LaHood*, 617 A.2d 1142, 1149 (1993) (quoting *Knill v. Knill*, 510 A.2d 546, 549-50 (1986). To the extent that EED's estoppel defense relies on facts underlying its contention that the term of the Agreement term was modified to month to month, this argument has been addressed. To the extent that EED's estoppel defense is predicated on the notion that Severstal's predecessors waived any breach of the Agreement, the Agreement clearly provides "no waiver of any breach or default in the performance of any covenant or agreement contained herein shall operate as a waiver of such covenant or agreement itself or as a waiver of any such breach or default in the future." (Severstal Mem. Ex. 1, Agreement at 18.)

may waive the requirements of a written contract by their conduct where, over a period of approximately two years, the parties conduct deviated from the requirements of the written agreement). As a general matter, the interpretation of a written contract is a question of law for the court. *Id.* Whether conduct subsequent to the execution of the contract amounts to a modification of contractual obligations is generally a question to be decided by the trier of fact. *Id.*

EED claims that following the sale of the Plant by Bethlehem to ISG, EED received a letter (the 30-Day Letter) from ISG purporting to modify the Agreement to alter its term from seven years to 30 days with automatic monthly renewals. (EED Reply at 16; EED Mem, Ex. A, Richard Brown Dep. at 81:11-15.) EED then contends that an alteration of the term of the agreement automatically abrogated their performance obligations.

EED's evidence supporting the existence and substance of the 30-Day Letter is vague and generalized. As noted earlier in this Opinion, neither party has presented, nor apparently can locate, a copy of this letter. According to EED, the 30-Day Letter "said that contracts would be honored until they were renegotiated. They would be honored on a 30 day basis." (EED Mem., Ex. A, Richard Brown Dep. at 81:11-82:6.) EED has not proffered any specific terms of this 30 day modification, or specified what other portions of the Agreement, if any, were modified. (*Id.*, Ex. A, Richard Brown Dep. at 83:12.) EED has noted that the 30-Day Letter was not specifically addressed to EED and did not expressly address the Agreement. (*Id.* at 162:13-163:19.) Instead "it was a generalized letter to suppliers and vendors . . . it was a kind of welcome letter to the suppliers and vendors saying we are here now . . . It wasn't anything specific to EED or to anybody in particular." (*Id.* at 162:14-163:7.) The record also includes a letter from EED to ISG conveying its impression that "since ISG took over" the Plant, EED "has

been operating on a 30 day contract." (EED Mem., Ex. E.)  EED claims that its understanding of the 30-Day Letter was confirmed by ISG's Plant manager on several occasions.  (*Id.* at 5, Ex. H, Jack Cargnoni Dep. at 28:16-30:1.)

Even accepting EED's claim that the Agreement Term was modified, its defense requires an additional leap: a conclusion that a modification of the Agreement Term automatically eliminates EED's obligation to undertake significant capital improvements and repairs with respect to the System.  Again, EED's evidence in support of this assertion is scant.  EED argues primarily that a limitation on its long term investment obligations following a shortening of the contract term is dictated by "common sense" because only a long term contract would permit it to recoup investment costs.  (*Id*. at 9; Ex. F, Jack Cargnoni Decl. at ¶10.)  EED also argues that its interpretation follows from the original intent of the parties because the seven year term was the consideration for undertaking long term repairs.  However, this construction is undermined by the clear language of the Agreement.  After the expiration of the initial term, the Agreement becomes a short term contract with either party permitted to terminate after 90 days notice. (Severstal Mem., Ex. 1, Agreement at 4.)  While the Agreement is clear regarding the conversion to a truncated term, there is nothing to indicate a corresponding alteration in EED's performance obligations.  At its core, EED's argument is that without a modification of its obligations, the Agreement is no longer profitable for EED.  Even if correct, this situation is insufficient to raise a genuine dispute of material fact as to the terms of the Agreement.  *See Harford County*, 704 A.2d at 433 (noting that changed economic circumstances alone do not provide a basis for unilateral modification of an existing contract).

EED contends that the parties' conduct since 2004 reflects a modification in its performance obligations.  On October 26, 2004, EED sent ISG a letter in which EED requested a

contract extension to permit significant capital repairs.  (*Id*., Ex. E.)  No such modification was made, and all significant investment ceased.  Under the original Agreement, EED would have been obligated to undertake the repairs without a contract extension.  Yet the records is devoid of any evidence indicating that Severstal's predecessors declared EED in default of its obligations or attempted to terminate the agreement.  (*Id*. at 11, Ex. C, Robert Brown Dep. at 36:11-18.)  Because Maryland law permits parties to modify the terms of a written agreement through subsequent conduct, *see University Nat. Bank,* 369 A.2d at 576, EED may have raised a dispute of material fact with respect to whether the Agreement was modified to limit EED's obligations.

Construing the Agreement as modified according to EED's proffered terms, Severstal's termination remains valid.  As EED concedes, the modified Agreement would permit termination upon thirty days notice, without cause.  (EED Reply at 16.)  The uncontested record establishes that Severstal provided EED notice of termination 35 days prior to terminating the agreement.  On September 10, 2008, Severstal notified EED that it was terminating the Agreement effective October 15, 2008.  (Severstal Mem., Ex. 7.)   In terminating the agreement, Severstal complied with EED's modification.  Therefore, whether I evaluate Severstal's termination under the original Agreement, or the modification proffered by EED, the conclusion remains the same:  Severstal properly terminated the Agreement.

However, Severstal is not entitled to its request for an order compelling EED to remove the system.  Specific performance is an equitable remedy available when damages are unavailable or inadequate.  *Cattail Assocs. V. Sass*, 907 A.2d 828, 844 (Md. Ct. Spec. App. 2006).  Severstal's primary argument for specific performance is that "there is no reason to believe that EED will compensate Severstal for the cost of the removal of the . . . System."  (Severstal Mem. at 22.)

However, a parties' refusal to pay damages does not affect the adequacy of a legal remedy. Furthermore, the Agreement contemplated this very situation, permitting Severstal to remove the system at EED's expense. (Severstal Mem., Ex. 1, Agreement at 17-19.) A legal remedy to Severstal's claims is, however, both available and, adequate. If Severstal's concern is that EEO does not have the financial capability to pay Severstal for the cost of removal, the same concern draws into question whether EED could afford to comply with an order issued by this court requiring specific performance.

**B.**

EED has moved for summary judgment for conversion of the System and for unpaid invoices for the months prior to termination.

Because I have concluded that EED properly terminated the Agreement, EED's conversion claim is without merit. Conversion is an intentional tort encompassing a present intent and physical act to exercise unlawful ownership or dominion over the personal property of another. *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985). The Agreement clearly specifies that EED is required to remove the system at its own expense, and it has simply failed to do so.

EED is entitled to summary judgment with respect to its claim for unpaid invoices for August, September, and October 2008 in the amount of $88,928.08. Severstal concedes that it withheld payment on the invoices. (Severstal Mem, Ex. 4, Answers to Interrogatories ¶¶10, 23.) The only dispute Severstal has raised to the amount claimed by EED is in the form of two answers to interrogatories asserting that EED has overcharged . . . for heat recovery in excess of the . . . System's capabilities."[2] (*Id.*, Ex. 4, Answers to Interrogatories at ¶23.) Severstal has

---

[2] In its answer to EED's interrogatories, Severstal claims that it was overcharged from March 2008 through October 2008. While the answer to this interrogatory properly disputes the amount of damages claimed by EED, it also

pointed to no other evidence to dispute EED's claim.  To overcome a motion for summary

judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." *Anderson*, 477 U.S. at 252.  In my judgment, Severstal's unsupported answers to two

interrogatories are insufficient to create a genuine dispute of material fact with respect to the

amount due under the invoices.


For the foregoing reasons, Severstal's motion for summary judgment is granted with

respect to its request for declaratory judgment regarding the propriety of its termination of the

agreement and entitlement to damages for costs associated with removal of the System. The

parties have not briefed the costs associated with removal.  If the parties are unable to concur as

to costs incurred by Severstal's during the removal process, Severstal may file an action for

relief.  However, Severstal's request for an order compelling EED to remove the System is

denied.  EED's motion for summary judgment is granted with respect to its claim for unpaid

invoices and denied with respect to its claim for conversion.  A separate order to that effect is

being entered herewith.



DATE:  <u>9/7/2010</u>                                    <u>   /s/                                    </u>
                                                                J. Frederick Motz
                                                                United States District Judge

---

appears to constitute a claim for restitution for invoices paid from March through July 2008.  Because no claim for
restitution has been pled in Severstal's complaint, Severstal is not entitled to relief for such a claim.